Activity Company, et al. Thank you. Thank you. I'm Bruce Bennett of Jones Day. On behalf of Jones Day, thank you very much. May it please the Court. There are three errors below, each of which require reversal of the District Court's order. The first point relates to Bankruptcy Code Section 552. As we say in our briefs, post-petition employer contributions are subject to bondholders' liens under 552B because they pay off and therefore correspondingly reduce the liability that employers already owe to the ERS pre-petition. This makes this case a little bit clearer and simpler than some other cases. As your Honors, I'm sure, recognize, the pension fund that we're dealing with here, there are multiple pension funds in Puerto Rico, but the one involved here was frozen in 2013. And that means that there were no further liabilities accruing after that date to employees, not in the pre-petition period between 13 and 17 or after the petition date at all. And in addition, all of the rights to receive the pension contributions were pledged. Now, there are three sections of the ERS Enabling Act that establish ERS's pre-petition right to receive the full actuarial cost of accrued pensions, meaning all of the benefits that were accrued up to freezing in 2013. I'm going to refer to them. They have two section numbers based upon the codification, but 2116E4 and 2116E5, those are the three sections. Now, the assertion that 2116E is the cornerstone of the repayment provisions prior to 2013, and it's asserted that these were somehow repealed and therefore of no further effect. But that's, as we say in our briefs again, that's not correct at all. It is true that the statute repeals the section, but then has a transition provision. The transition provision preserves everything in chapters 1, 2, and 3. The relevant provision 2116E is in chapter 2. It preserves that provision to assure payment of the benefits that were accrued prior to the 2013 freezing. And I think even the Oversight Board concedes that 2116, including 2116E, covers the entire actuarial liability and is not just dependent upon employer contributions that are allocated among the different employers based upon their then current payrolls, again, having nothing to do with the benefits that were accrued and which workers accrued them in 2013. This is clear. First of all, as I'm sure you all recognize, this isn't an unusual way to change a statute, to have a repeal and have a transition provision. We deal with here, as with the prior appeal, the Uniform Commercial Code. It's updated many times, and when it is updated, the prior version is repealed, and then there's a transition provision that says when you look at the prior provisions and when you look at the new provisions. And we believe that not only is the transition provision itself clear, but there's a statement of motives provision that describes what the legislature thought it was doing in 2013. I'd like to pose a question, and I pose it with some trepidation because you may well tell me that it's irrelevant, doesn't make any sense. You would probably be plighter than that, but there's a lot of complexity here. My question is this. If the employers, I know this is counterfactual, but if the employers simply stopped making the statutorily required contributions, what recourse would the employee retirement system have? Historically, what remedy would they have had available, or what could they do now? Could they sue some contractual theory that these payments had to be forthcoming? Well, they have numerous rights to collect, and I'm sorry I don't have the statute provisions with me, but I will, when I come back, I'm sure, apply because they didn't come up. But there's even a point, I think, and I'm remembering that part of the law even involves the possibility of penalties, criminal penalties. So there are collection provisions. That may be, perhaps that's the only remedy. Well, that's right. I mean, your hypothetical is unclear in one respect, and I think you were, if I'm going to interpret you as saying that every single employer in Puerto Rico stopped making payments because what was really created is what's analogous to termination liability in other environments is that this was joint and several among all of the employers, which kind of makes sense because you know you're going to have certain government functions, and if you start reallocating government functions among different entities, maybe the liability should be reallocated among different entities. The tying the one prong and only one prong of the liability to the then current employment levels at particular agencies is just a way to distribute a liability that all of them had in a reasonable way. It was a proxy for where people are working and how much activity there is at particular entities. So the only time your hypothetical comes up is when they're all gone and no one's doing anything anymore, which would be, of course, a tragedy, and it would be a multidimensional tragedy far beyond how to get pensions paid. Yes, I'm trying to get at this concept of a sort of what was the nature of the employer retirement system's pre-petition property right, which seems to be really critical to this case. And so the remedy that they might pursue in the absence of employers meeting their statutory obligation arguably informs that question of what was the nature of their property right, and if in fact the employment retirement system had a very limited remedy, perhaps only seeking criminal penalties against those who refused to pay, that might say something significant about the nature of that pre-petition property right, and the bondholders cannot have a greater property right than the debtor itself, right? I acknowledge that, Your Honor, and this whole case demonstrates that the debtor believes that the pensioners had absolute rights to collect their pensions, and they only decided that they didn't have absolute rights to collect their pensions when they came to deal with the bonds. And the plan of adjustment that has been filed pays pensioners more than 95 cents on the dollar. So it is interesting that this comes up all in this context. When I refer to the criminal penalties, it's not the only provision. Frankly, the provisions themselves are fairly self-actuating. They create an obligation, and once they create an obligation, the other side has a right to receive it, and therefore a right to enforce it. Okay, that's the statutes you referred to, the Puerto Rican statutes, refer to obligations on the part of the employers once the employees have done the work to make contributions. The obligation language is as to those employers. There seems to be missing from the statutes a corresponding set of, I'll drop the word vested, that's another issue, and a corresponding set of rights, if you will, in the system itself to go after those contributions. That is essentially the question that Judge Lopez was asking you, and I'm sorry, I don't think we've gotten a clear answer from you yet. You just said it's self-effectuating if there is an obligation on the part of the employers who have to make contributions. That somehow the pension system must have had a right to collect. I don't understand that. I don't understand why it's self-effectuating when the legislature could have written explicit language to that effect and it chose not to. Well, a basic note doesn't say party A is obligated to pay party B, and then party B is obligated to collect from party A. This isn't a note, this is a statute, and you've accepted the premise that the debtor cannot give away greater rights to bondholders than the statute allows. Well, I think one other thing I want to point out is that the resolution assigns to the bondholders themselves the right to collect these things. There's actually a right to collect that's been assigned to the bondholders in the resolution. So, first of all, it clearly implies that the ERS thought they had the right to collect these monies, and I do think that... Pre-petition, but why does that apply post-petition? Because it's stayed by the automatic stay temporarily, but the right isn't dissolved by reason of the fine or the petition date at all. All of the rights that the bondholders have with respect to their liens are their rights. If it proceeds a pre-petition collateral, it continues all the way through the bankruptcy case, it may be stayed temporarily during the pendency of the bankruptcy case, but ultimately either because of relief from automatic stay or because the issues are resolved in a plan, those rights remain enforceable and available to the creditors to have them. I share Judge Lopez's view that this is quite a complex case. One of the arguments that is made in response to your argument is the right to collect was only in pledged properties. And if you follow that through and you look at the statutes involved, it doesn't fall, these post-petition contributions don't fall within the definition of pledged properties. I believe that argument is being made. Yes, the argument has been made, and it's involved in another part of an adversary proceeding below. Frankly, when you read the section that they appeal to in the entire quote, which isn't in their brief, the list of sections applies to the rights in lieu thereof, not to the beginning of the clause by basic statutory constructive principles, and also in this case that there are two separate tenses on the front side of the provision and the back side of the provision. So we don't think that the list of three provisions limits the rights to receive, it limits the rights to capture other property distributed in lieu thereof. It's only the second part that's modified. Counsel, finish your answer, go ahead. Okay, so with respect to, first of all, 2116 is one of the listed provisions as is 4113. Counsel, I might pose my question. There's a lot of discussion here about the Cato case and how it helps one side or the other. I'm struggling to understand how Cato helps you in this sense. What you have in Cato, I believe, is an account receivable. A security interest is granted in that account receivable. And then when the money that was in escrow pre-petition becomes available, the security interest attaches to that. I don't see where we have here anything that is equivalent to an account receivable. You have the possibility of future payments in the form of the employer contributions. You say that they are collectible, but are you somehow arguing that what you have, this right to receive future payments, is somehow comparable to the account receivable that seemed to be so central to the Cato decision? Yes, Your Honor. We think, frankly, the ERS's rights and, in turn, our rights are, in fact, stronger. The obligation was completely liquidated or completely established in 2013. It was owing on that date. It was an obligation on that date. In the Cato case, there was an amount in escrow, but the amount wasn't payable until or unless the settlement was approved. So it is a more contingent obligation that was pledged than existed in the case. But the funds that were in the settlement funds, that work had already been done. There was something more that had to be done in terms of getting approval, but that was a fixed sum. The work had already been done pre-petition. Isn't that so? Well, in our case, too, the work by employees to earn it had been already done pre-petition, already done in 2013. Why is that the issue rather than the ongoing contributions which depend on work being done post-petition? I don't understand why that would be our focus. Okay, so the pre-petition lien is on the obligation which we contend was fairly well fixed back in 2013. And now the question is, there's proceeds that may or may not come. We think the cases say that if the proceeds may or may not come, that the lien still travels to the proceeds. That the contingency with respect to, frankly, in the typical case, the collection of accounts receivable, it might or might not be paid, but there's still a lien on proceeds with respect to the accounts receivable. We do have a classic analysis to accounts receivable, even though it's a payment intangible. The obligation existed because the employees who got the pension benefits had finished their work. They couldn't get any more benefits after 2013. The only contingency left is, will it be paid? Okay, just factually, how much money are we talking about? Back in 2013, when the pension plan was frozen, the legislative history says they estimated $25 billion. Today they think that estimate was too low. Did you say million? Billion, $25 billion. I thought you said that. That's what I said. Thank you. Good morning, and may it please the court. My name is Martin Bedenstock. My term as prosecutor was for attorneys for the Oversight Board generally and as Title III representative of ERS. I'm hoping to simplify things by showing first the language of the security agreement and statutes does not grant the bondholders the security interest they claim to have. And second, the employer's contributions cannot be perceived as matters of fact and law. Then I will explain, A, the HRC decision, whose reversal was unreported, but we still apologize for not discovering that, was not reversed on any issue pertinent here, while its remand instructions forcefully support ERS's, our position here. And B, the commonwealth government's movement of monies from its left pocket to its right pocket cannot render the money special revenues. I also must mention that at page 7 of Andalusian's sir reply brief filed the other night, appellants claim that in their primary authority, Schlickman, the lender, quote, had no lien on the contingent fee contract, only on the groten fee receivable, end quote. That is a misstatement of the facts of Schlickman. On page 267F3rd at page 20, this court wrote, quote, similarly, Cato had a security interest in the firm's contingency fee agreement relating to the groten matter and the proceeds from that agreement, end of quote. When I finish, the retiree committee hopes to cover the constitutional avoidance and certain other issues. It's common ground that the pledged employer contributions are post-petition payments, and Bankruptcy Code section 552A eliminates the bondholder's security interest in them, unless under 552B1 they are proceeds of pre-petition property of ERS. That is the general rule with the public policy being to free up a debtor's assets to post-petition assets. Here is part of an overall effort to create a sustainable economy for the Commonwealth of Puerto Rico. Recognizing a pre-petition security agreement purporting to grant a security interest in post-petition employer contributions without more would be ineffective. The bondholders claim, one, they had a petition date security interest in an ERS payment intangible, entitling ERS to employer contributions covering ERS's entire actuary of deficiency, and two, the employer contributions are proceeds of collections on the payment intangible. But I will show your honors, one, the express limited language of the security agreement did not grant them a security interest in the entire actuary of deficiency, and the way the statute defines the deficiency, it is an impossibility for the employer's contributions to be proceeds or collections on it. The security agreement is on page 465 of the appendix. When one goes through the series of definitions of pledged property, revenues, etc., it all comes down to... Counsel, could you just work, please continue, but could you just work into your argument, the significance of what happened in 2013, your opponent attaches great significance to that. It would be helpful to me to understand what exactly happened in 2013 and how that might affect the legal arguments that are being made. If you can just sort of work that into your response. The short answer is we don't believe it has any impact. In order to not increase liabilities, pensions were frozen, but they were frozen for... The effect of that is obviously retirees already had what they had. So by freezing them, you're only talking about dealing with the active workforce who had earned what they earned for pensions but couldn't earn further pension amounts. May I ask you a question about that? Sure. So the security agreement is... all the terms in the security agreement were in place prior to 2013? Yes. And at that point, it's an expectancy as opposed to a property right? I think everyone agrees on that, isn't it?  So in 2013, they're frozen and liquidated. The argument on the other side is that that somehow converts it to a property right? Is that your understanding? You don't have to speak... I'm just trying to see what you're arguing against. What you think you're arguing against. We have the same issue that Judge Lynch raised, which is why does it matter what happened in 2013 and the labor before that? The income streams we're talking about are income streams based on future labor, future actual payroll. And as I'll point out in a few minutes, based on future appropriations of future legislatures and governors. And that's specifically in Section 2-16. Okay, you're walking away from my question I think. Oh, I'm sorry. Yeah, I'm still waiting for an answer on my question. Which is, if we're all agreed that it's an expectancy before 2013, something happened in 2013. Is it your understanding that your opponents argue that that's what converts it to a property right? No, that's not my understanding. My understanding is their argument is that the security agreement with its defined terms granted them a lien against an obligation of employers for the whole deficiency of the system. And therefore every payment is a proceed or collection on that. And we take issue with the fact that the employers were ever liable for the whole deficiency. And I'll explain why in a moment. And I'll also show, I hope it will convince you, that the employer contributions that they have liens against or security interests in cannot be proceeds or collections on that deficiency that they're talking about. Counsel, aren't they in part, they're focusing on 2013 because they're responding to an argument that was made by the district court that there was something unquantifiable, uncertain about the amounts involved. I think they're arguing that as of 2013, because the pensioners could not accrue any more benefits, it had become a fixed, not a fixed, but terminable number. Isn't that why they're making that argument? I don't believe so, Your Honor. Because when it comes to pensions, the investment return rate, the mortality rate, all kinds of factors that you can only guess and estimate are at play. So you don't have a fixed number as of 2013. You've only fixed, you know that the benefits will not increase any further in amount per employee, per active employee. But even absent the freeze, you would know at what rate they would otherwise increase. So no additional certainty was created. Okay, thank you. And it doesn't help your argument. Your argument is pre-2013, they never were given a property interest in the contributions from employers we're talking about. Well, yes, and I'll explain that right now. Okay. They're given security interest in the three statutes in the definition of employer contributions, which I will go through in a bit of detail. 2-116 is the main one, as Mr. Bennett said. And its terms, well, it will show in a minute. But there is no grant in the entire Enabling Act of an obligation of employers to pay the deficiency. They're supposed to pay what they're told to pay. And I'll go through the two statutes that impose payment obligations on them. There's nothing else that says, well, that's going to leave a deficiency, so under this other statute, you'd have to plug the deficiency. The statute doesn't exist, and if it did, they don't have a lien on it. So it's impossible that they have a lien on something that plugs the deficiency, because it just doesn't exist. Now, on the definition of employer contributions, as I said, I'm sure your honors read the three. They're given the security interest in the amounts received by the system that are payable under the three statutes. The main one being 2-116. 2-116A and B explain that the employer's contributions should cover what they should cover, and they provide a formula to determine the contributions. Subsection D directs the employers to pay a flat 9.275% of actual payroll going forward for each successive year. And the official statement at page 305 explains that that's not actuarially determined. That's just whatever, for their political, practical, business, whatever reasons, they fix the amount. This is the amount the employers are going to pay annually. The action here comes in the most important subsection, 116E. It provides that any difference between the contribution required by 2-116C3 and the 9.275% contribution, quote, shall constitute a deficiency in the employer contribution. The obligation accrued as a result of this deficiency shall constitute an actuarial deficit for the system and an obligation of the employer, end quote. The reason that's so important is that the deficiency that the employers are made liable for is determined after their annual contribution. So their annual contribution does not pay down the deficiency. There's nothing in the statute that pays down the deficiency that 2-116E identifies. There is nothing. And to answer a question I think Your Honor asked earlier, Judge Lopez, about what happens with that, the official statement has a statement that says the commonwealth will probably just pay it. Not all employers are acting, the commonwealth will pay it. There is nothing in the statute requiring its payment. That's why they can't have a lien on it, and that's why it's not proceeds or collections on what they do have. Now, the official statement is also full of, well, first let me cover the other statutes. 3-105 is the same fixed percentage requirement applicable to salaried employees. It has the word salary. And 4-113 doesn't impose a payment obligation. It says it's the intent of the act that the contributions required from the employer shall constitute obligations of the employer. They basically realized after all the briefings, as the briefing was in progress, simple future expected receivables don't get them where they need to go because there's no petition date property interest. So they created the theory that somehow you can read the statutes to give them a lien on an obligation of the employers to solve the whole systems under funding, but that doesn't... Counsel, they do point to a change in the language of Article 9 of Puerto Rico's Uniform Commercial Code which seems to expand the concept of collateral to which a lien might attach. And the language they cite does seem to represent an expansion of what the language had been before. It talks about collected on collateral or rights arising out of the collateral. That may not be the precise language, but I know you know what I'm talking about. So how do you respond to that? Two important points. First, when Congress wrote the words proceeds in Section 552B, that was before the revision of the UCC. So Congress clearly had an intent about the definition of proceeds that preceded the definition. I don't think the revision of the Uniform Commercial Code changes the meaning of the statute that was written before it. That's number one. Second, even with the revision, you still need collections on the receivable. Proceeds of the receivable which is some type of disposition, transformation of the receivable. There are none here because the statute only requires these fixed payments. Fixed percentage of payroll going forward. And it contemplates every year it's not going to be enough. There will be a growing deficiency because you're barely covering the actual out-of-pocket. But there's no statute and they don't have a lien in the proceeds of any statute that fills that deficiency. And the official statement, going to some earlier questions, Your Honor, the official statement says, hey bondholders, the legislature at any time can adversely change the employer's contribution. And it might do that if there's severe financial distress. And you don't have any other recourse. So number one, I think under those circumstances, criminal liability is unlikely because they were warned under financial distress the legislature might have to change it. My additional point as to why it's truly an expectancy is that 2-116G, we didn't spend much time on G, it's in the briefs but we didn't discuss it, says every year there should be an appropriation to the employers so they can pay the contribution. May I just finish the quote? Yes, of course. Thank you. Since we're dealing with a municipality and we're talking about paying police, firemen, teachers, etc., these people aren't generating revenue for you, so the only way to pay them is to get money and the only way to pay the surcharge, the employer contribution, is to get money appropriated to you. So the statute says there shall be an appropriation every year. Well, one legislature can't find the next or the governor. That's how much of an expectancy and an uncertainty and a risk they were taking. I'd love to go on but my time is up. It seems that to try to reduce all the complexity to what your essential argument is, that almost seems to be your essential argument, that we are in a statutory environment, the obligations are statutorily created, legislatures can always change those, hence the bondholders have to understand that given the statutory environment, there is a risk that the promises, the obligations set forth in the statute can change and hence ultimately all they have is an expectancy. They don't have a property right that you might have in the private contractual environment. That's just not where we are. And that's exactly what the bondholders knew. The official statement made crystal clear and that's why they got 6.8% triple tax free as opposed to the more conventional 5% for municipal debt. They could have said we are not buying these bonds unless you give us a statutory limit. Unless there are real special revenues. I understood that this case did not raise this broader issue of bondholders can never, when it's a statute, have more than an expectancy. I understood this case to be about the official statement, the language in it, and the fact that that language includes a reference to the risk and that we don't need to go any broader than that particular argument. Well, I would add to that, Your Honor, that it's just not so simple to say contractor statute, therefore this, therefore that. They have to see what they say. Exactly. Thank you. May it please the Court. Catherine Stegi on behalf of the Official Committee of Retired Employees. The retiree committee represents 167,000 approximately retirees of the Commonwealth of Puerto Rico and has a great interest in the outcome of this case. I raise it only because counsel raised it. The bondholders counsel made the comment that there's an agreement between the retiree committee and the board with regard to restructuring under a plan. That's really not relevant here. That agreement doesn't indicate in any way, shape, or form that counsel's argument that they had a fixed due and payable receivable for the entire amount of pension liabilities such that that wouldn't exist at pre-petition. That agreement is reflective of post-petition negotiations between the party and reflects the sad reality of the state of government employees in Puerto Rico where more than half of them receive a pension that is less than the federal poverty level. With regard to the merits of the action, your Honor's question with regard to the Cato case, I think, points out something that's very loosely used in the bondholders' papers, this whole idea of contingent allegations or expectancies. In the Cato case, which does not help them at all, there was a fixed, definite contract. Now, that contract might not have yielded any result. It was a contingent fee agreement between counsel and a client. Counsel hadn't prevailed in the case and obtained the funds that they obtained for the client. They wouldn't have gotten a fee, just like any receivable has contingencies associated with it. The other party, by default, might not be able to pay, whatever that might be. But there is a fixed, payable obligation if all of the conditions in that agreement come due. That's contrasted to what you see here with the employer contributions that the bondholders had a lien on. You have to go to the security agreement and the definitions that are contained therein. If you work through pledged properties as revenues, revenues are those amounts that are paid to EOS. It then refers to employer contributions. However you come out on this debate about the qualifying statutes, however they apply, what that definition says is it's either amounts that have been paid to ERS or that are payable to ERS. That's the question. What was payable to ERS at any given point in time? When you go to the statute, what becomes payable at any given point in time is premised on the monthly payroll of the employers. Each month the employer takes, initially the administrator sets the rate for the year, and then each month when the payrolls come due, the employer calculates the contribution rate that is required to be paid and is required to pay that within 15 days of paying the employees. That's when something is payable. That's why this argument that everything that is owed to pensioners somehow is subject to their collateral is incorrect. And when you view it that way, then Judge Swain's decision makes perfect sense. What she's doing is she's trying to figure out did we have new collateral post-petition or did we have proceeds? And so she looked to see at the language what was payable. And she determined, as the statutory language indicates, that what became payable only became payable once a payroll period passed and you applied the rate to the amount of payroll by the particular employer. And therefore, that's why she's looking at the post-petition labor and work that's done by employees and concluding that that creates a new property interest and therefore is not proceeds of collateral that the debtor would have pledged to the bondholders pre-bankruptcy. That's also why the constitutional avoidance argument you never really need to get to because there are no constitutional problems. The only thing that 552A takes away from the bondholders is a contractual right. And as the Security Industrial Bank case that they cite in their papers and we cite provides, the court has long upheld the ability using the Constitution's bankruptcy clause to impair contractual rights retroactively using the bankruptcy code. And here all 552A does is take away a contractual right to get a lien in something that comes into existence post-petition. It does not take away any lien rights that existed on the petition date. So unless the court has any questions for me, we would ask that the court affirm. No, thank you. Thank you. Okay, a couple quick points before I get to the statutes. The risk that the statutes could change does not mean that the lien would not apply if they don't. It's a contingency. And as I indicated before, a lien on an account receivable and its proceeds isn't frustrated because the account receivable might not be paid or might be discharged in a bankruptcy or might otherwise go away. It's just another contingency that affects the receipt of proceeds. But if proceeds are there to be subject to a lien, they are. Now as to the statutes, we have a newer and a little bit better, I think, supplement that walks through the statutes and shows you what they look like as they change through time. The 2-116 at the very beginning, A, that existed at the time of the 2013 change says, employer contributions shall cover the difference between the total cost of the benefits provided by the system and the cost of administration reduced by the portion contributed by participants. All of the provisions that follow, including D and E, which my friend spent time on, implement that one sentence. There is absolutely an obligation to pay the benefits, as one would expect. Now, how does it get enforced? It's an obligation of the employer under E, which we talked about before. But then we move to 1-110, and it says, this is the enabling provision. The administrator is authorized, last sentence, the administrator is authorized to acquire public enterprises or municipalities to make additional payments to eliminate said shortages. Require. And the administrator may exercise his discretion to establish the manner in which such payment is made. If he requires it, the court should be willing to enforce it. It's crystal clear that it goes both ways. Lastly, to the extent there's confusion about this, another part of the statement of motives indicates exactly what the legislature intended to accomplish. This is at supplemental addendum page 6, and I'm reading from starting at the parenthetical, but I'm not taking it out of context. It's a parenthetical. And which, which is referring to the pre-13 approvals, shall in spite of all the changes contemplated herein make additional appropriations of approximately $100 million annually to cover the system's cash flow deficit. However, it must be clear that the benefits accrued by active public employees under the laws that cover them up to the effective date of this act shall subsist and shall be paid in accordance with the provisions of said laws. The legislature did not intend the payment of pensions to be optional. They did not intend that the payments of, of the, of employer obligations on account of the frozen pension liability was optional or, or, or of expectancy. They demanded that it happened. They used words of the English language that show that. But how, how does that alter the fact that this obligation will be funded by, I think this is a point that Judge Lynch made earlier, that will be funded by the ongoing employer contributions that are based upon new work being done by employees in the system. I mean, that, that is how these systems work. And that, everything you say there does not change that fact. The statute changes that fact, Your Honor. It, working through to 116, D refers to allocating the liability based on current payrolls. And as Mr. Bean has now correctly said, those, the effort doesn't generate money. Tax revenues generate money. It's the Commonwealth tax base that generates money. The workers are performing services for, services for the population. It's one component, just subsection D. There's also subsection E. And, and most importantly, there is subsection A that makes the payment of the obligation absolute. It, it, it can't be interpreted another way. The, the, and also as I said before, it, it kind of defies common sense and certainly defies the legislator's statement of motives that they would have made the payment of pensions that contingent. They didn't. They allocated part of the liability, part of the liability based upon the payroll of entities. But they said in no uncertain terms that the obligation was going to be paid one way or another. They gave the administrator the, the, the, the power to require the payments. The, these are not payments that are made just if there are employees or not. They are payments that are made, to be made one way or another. And so the, your basic point is given that language, there's nothing contingent. There's nothing, this cannot be characterized as a mere expectancy. Is that? That's correct, Your Honor. And if I may add one more sentence. The idea that statutes when passed and they're being the basis for financings can be freely repealed. That's been refuted by lots of cases. That argument was never made anywhere else. There's, there's lots of cases. They become legislative covenants when a legislature passes a law that facilitates a financing. The, the, the people rely on these. They rely on words like shall when they finance revenue streams that are created by statute. If the word shall, shall be paid isn't enough to make a revenue stream strong enough to, to support financing, there won't be financings. This was an absolute revenue stream broken down into little pieces. They're focusing on a little piece, a little piece of the revenue stream. Thank you. Thank you. As might not be surprising in a complex case like this, we did not apply the rebuttal rules with precision. So Mr. Bienenstock, if you would like two minutes for sir rebuttal, you're entitled to them. Thank you very much, Your Honor. Thank you. The payments to the retirees, Your Honors, and ultimately to the actives who later retired, under the system at all times, barely got them to the pop, the federal poverty level. And the Commonwealth is going, is paying them out of general revenues now because otherwise you're talking about hardworking people who would be put on the streets. That's not what this case is about. This case is about an additional amount that the bondholders are saying has to be taken from the Commonwealth to pay their bonds after they were told in no uncertain terms in the official statement that the legislature could, could adversely change the statute. The extreme would be no more employer contributions at all in excess of the amount necessary to pay, to pay the retirees their pensions. Now, counsel, I submit, is squishing together some things that gives the wrong impression. The bondholders' lien is on those payment streams we identified that go into ERS. When the Commonwealth pays the pensioners out of its general revenues so that they have a roof over their heads and they can eat, that money isn't going to ERS. So the mandatory language that they're referring to is, was directed in the official statement and the statute to the people, we are going to pay your pensions that you worked your whole lives for. It wasn't directed to the bondholders. The bondholders got their official statement that told them in no uncertain terms we might change this, especially if we're under severe financial distress and we may change it adversely to you. And for the high enough interest rate, they made that deal. Thank you. Thank you all.